1 P.3d 706

CITIZENS CLEAN ELECTIONS
COMMISSION, Petitioner,

v.

Hon. Robert D. MYERS, Presiding Judge of the Superior Court of the State of Arizona, in and for the County of Maricopa, Respondent,

VotePac, a registered Arizona political committee, David Armstead, Edward J. Cirrillo, Rick Lavis, and Betty Rockwell, Real Parties in Interest.

Arizonans For Clean Elections,
Petitioner/Defendant–
Intervenor,

and

Citizens Clean Elections Commission,
Defendant–Intervenor,

v.

Hon. Robert D. Myers, Judge of Maricopa County Superior Court, Respondent,

and

Betsy Bayless, et al.,
Respondents/Defendants,

and

VotePac, a registered Arizona political committee, David Armstead, Edward J. Cirrillo, Rick Lavis, and Betty Rockwell, Respondents/Plaintiffs, Real Parties in Interest.

Nos. CV–00–0054–SA, CV–00–0055–SA.

Supreme Court of Arizona,
En Banc.

June 16, 2000.

**518**

Janet A. Napolitano, Attorney General By W. Scott Bales, Joseph A. Kanefield and Dennis K. Burke, Assistant Attorneys General, Phoenix, Attorneys for Citizens Clean Elections Commission.

Meyers, Taber, Meyers By Lisa T. Hauser, J. Tyrell Taber, Phoenix, Attorneys for Vote-Pac, et al.

Arizona Center for Law in the Public Interest By Timothy M. Hogan, Jennifer B. Anderson and Tina A. Calos, Phoenix, Attorneys for Arizonans for Clean Elections.

Janet A. Napolitano, Attorney General By W. Scott Bales, Joseph A. Kanefield, Dennis K. Burke, and Charles S. Pierson, Assistant Attorneys General, Phoenix, Attorneys for Citizens Clean Elections Commission and Betsey Bayless, Secretary of State.

Meyers, Taber, Meyers By Lisa T. Hauser, J. Tyrell Taber, Phoenix, Attorneys for Vote-Pac, et al.

## O P I N I O N

MARTONE, Justice.

¶1 These are consolidated petitions for special action brought by the Citizens Clean Elections Commission and the Arizonans for Clean Elections against VotePac and others seeking expedited review of an order of the Superior Court of Arizona in Maricopa County holding that the Citizens Clean Elections Act, A.R.S. §§ 16–940 to –961, violates the Arizona Constitution and is thus invalid. Given the imminence of the year 2000 general election and its statewide importance, we agreed with the parties that this case presented an appropriate occasion in which to exercise special action jurisdiction directly in this court. *See* Rule 7(b), R.P. Spec. Actions.

I.

### Background

¶2 The Citizens Clean Elections Act was adopted by the people as an initiative. It establishes a complex system of public campaign financing for participating candidates who agree to limit their fund raising and spending in statewide elections. It also reduces contribution limits for candidates who choose not to participate. *See* A.R.S. § 16–941. The Citizens Clean Elections Commission is responsible for administering the program. *See* A.R.S. § 16–955. Arizonans for Clean Elections is the committee that promoted the initiative measure. VotePac is a political committee which, along with the individual real parties in interest, brought an action in the Superior Court of Arizona in Maricopa County against the Governor and Secretary of State seeking a declaration of the Act's invalidity under the Arizona Constitution. There are thus no federal issues before us. The defendants chose not to participate and instead deferred to the intervenors, Citizens Clean Elections Commission and Arizonans for Clean Elections. Agreeing that there were no factual disputes, the parties filed cross-motions for summary judgment.

¶3 The state constitutional attacks revolve around the ways in which persons become members of, and are removed from, the Citizens Clean Elections Commission. Under the Act, members are appointed by statewide public officials, beginning with the Governor, by alternating political party affiliation. A.R.S. § 16–955(B) to (D). "[M]embers of the supreme court in order of seniority" are among the officials who may appoint. A.R.S. § 16–955(C). It has happened that the next highest ranking statewide officeholders were members of this court, each of whom promptly disqualified himself and herself.

¶4 The officeholders must appoint from lists of three candidates nominated by the Commission on Appellate Court Appointments, A.R.S. § 16–955(B) to (C), a commission the constitution vests with the responsibility to screen and nominate candidates for appellate judgeships. *See* Ariz. Const. art. VI, §§ 36 and 37. The Chief Justice of this court is the chair of the Commission on

Appellate Court Appointments. *Id.* at § 36. Members of the Clean Elections Commission may be removed by the Governor for statutory causes, but only with the concurrence of the senate. A.R.S. § 16–955(E).

¶ 5 The trial court held that the involvement of members of this court on the Commission on Appellate Court Appointments and in the appointment of members to the Clean Elections Commission did not violate the separation of powers doctrine; that subjecting the Governor's removal authority to senate approval did violate the doctrine of separation of powers, but that such provision was severable; that the title "Citizens Clean Elections Act" is constitutionally valid; but that the expansion of the duties of the Commission on Appellate Court Appointments beyond the scope of judicial appointments was repugnant to the Arizona Constitution and such provision was not severable.

¶ 6 In their consolidated petitions for special action, the Citizens Clean Elections Commission and Arizonans for Clean Elections contend that the trial court erred in concluding that the use of the Commission on Appellate Court Appointments to nominate candidates for appointment to the Citizens Clean Elections Commission violated the Arizona Constitution. If it does, though, they claim that part of the Act is severable and thus the remainder of the Act should survive. They also contend that the trial court erred in concluding that the senate's role in the removal of commission members violated separation of powers.

¶ 7 On cross-petition, VotePac contends that the trial court erred in concluding that the involvement of members of this court on the Commission on Appellate Court Appointments and in the appointment process did not violate separation of powers. It also contends that the trial court erred in concluding that the title of the Act was substantively valid under the constitution.

## II.

### Commission on Appellate Court Appointments

¶ 8 Article VI, sections 36 and 37 of the Arizona Constitution vest the Commis-

sion on Appellate Court Appointments with but one function: the authority to screen and nominate candidates to the Governor for appointment to the appellate courts of Arizona. These provisions contain no express grant of power to the legislature to enlarge the function or scope of the Commission. *See* Ariz. Const. art. VI, §§ 36 and 37. In contrast, other article VI grants of power do contain some express grants of authority to the legislature. For example, article VI, section 5 specifically describes the jurisdiction of this court, along with "[s]uch other jurisdiction as may be provided by law." Ariz. Const. art. VI, § 5(6). Article VI, section 9 allows the legislature to create an intermediate appellate court and give it such "jurisdiction, powers, duties and composition ... [as] shall be provided by law." Article VI, section 14 defines the jurisdiction of the superior court, along with "such other jurisdiction as may be provided by law." Ariz. Const. art. VI, § 14(11). Article VI, section 32 provides for the jurisdiction of the justice courts and other "courts inferior to the superior court," along with such jurisdiction "as provided by law."

¶ 9 When we venture outside the scope of article VI, we find the same pattern. For example, under article XV, section 6, the legislature is granted the authority to enlarge the powers of the Arizona Corporation Commission. Under article V, section 9, the duties of the Secretary of State, Treasurer, Attorney General, and Superintendent of Public Instruction "shall be as prescribed by law." Under article XIX, the legislature "fix[es]" the duties of the State Mine Inspector.

¶ 10 VotePac argues that if we were to just look at the language of the constitution and compare article VI, sections 36 and 37 with all other provisions of the constitution, one would conclude that the different treatment must have some significance. One conclusion that might be drawn from textual analysis alone is that where the constitution intends that the legislature have the power to expand the duties of a constitu-

tional entity, the constitution will so state.[1] The corollary would be that if the constitution does not so state, then the functions and the duties of the constitutional entity are only those specifically described by the constitutional grant of authority.

¶ 11 The Citizens Clean Elections Commission and the Arizonans for Clean Elections argue that we have held otherwise. They turn to *Cox v. Superior Court*, 73 Ariz. 93, 237 P.2d 820 (1951), and *Earhart v. Frohmiller*, 65 Ariz. 221, 178 P.2d 436 (1947) for the proposition that unless the constitution expressly denies the legislature a particular power, it has it. From that, they argue that since article VI, sections 36 and 37 do not expressly prohibit the legislature from adding to the functions of the Commission on Appellate Court Appointments, the legislature may do so.

¶ 12 We believe Citizens Clean Elections Commission's and Arizonans for Clean Elections' reading of *Cox* and *Frohmiller* omits any consideration of the doctrine of implied limitations, expressly acknowledged in *Cox* and *Frohmiller*. In *Cox*, the issue was whether the legislature could vest the superior court with appellate jurisdiction over cases that originate before an administrative agency. Article VI, section 6, as it then existed, [now article VI, section 14] provided that the superior court had appellate jurisdiction over cases arising in justice and other inferior courts "as may be prescribed by law." *Cox*, 73 Ariz. at 95, 237 P.2d at 821. It was argued that because an administrative agency was not a justice or other inferior court, the legislature had no power to enlarge the jurisdiction of the superior court. We rejected this contention and held that "unless the constitution has prohibited the legislature from enlarging the appellate jurisdiction of the superior court, it has, in exercising the sovereign power of the state, the power to enlarge but not diminish such appellate jurisdiction." *Id.* at 97, 237 P.2d at 822. We relied on *Frohmiller* for the proposition that

we do not look to the constitution to determine whether the legislature is authorized to do an act but only to see if it is prohibited. *Id.* at 96, 237 P.2d at 821. But we also relied on *Frohmiller* for the proposition that "except for those things *necessarily inhibited* by the Federal or state constitution, the state legislature may pass any act." *Id.* (emphasis added).

¶ 13 In *Frohmiller*, the question was whether the legislature could constitutionally authorize the payment of subsistence and lodging expenses to those members of the legislature and their employees who were away from home while attending legislative business. 65 Ariz. at 223, 178 P.2d at 437. It was argued that because the constitution did not expressly authorize the legislature to enact a per diem statute, it could not do so. We rejected this argument and said that the legislature does not need express authorization to enact legislation. *Id.* at 224, 178 P.2d at 438. But we also acknowledged that the legislature is subject to any limitations imposed by the federal and state constitutions. *Id.* It was argued that the provision for subsistence and lodging was an improper increase in compensation under article IV, section 1(2) of the constitution. We upheld the statute stating that repayment for personal expenses "does not constitute additional compensation but is merely a reimbursement." *Id.* at 226, 178 P.2d at 438.

¶ 14 We certainly agree with and reaffirm the rule of *Frohmiller* and *Cox* that the legislature need not look to an express grant of authority in order to justify an enactment. But we also agree with *Frohmiller* and *Cox* that any exercise of legislative power is subject to the limitations imposed by the constitution. And just as no express grant of authority is required, there is no requirement that a limitation be express. *See State v. Osborne*, 14 Ariz. 185, 206, 125 P. 884, 893 (1912) (holding that an act may be repugnant to the constitution even where

---

1. Just because the constitution expressly authorizes the legislature to enlarge the jurisdiction of a court or entity does not mean that such power is unlimited. As we shall see hereinafter, there are, of necessity, implied limitations on the grant of express power. Given the structure of our

tripartite form of government, we believe the express grant of power to expand the scope of an article VI entity of necessity must be related to, and not impair, an article VI function. *See* Ariz. Const. art. III.

there is "no express prohibition.") A limitation may be implied by the text of the constitution or its structure taken as a whole.

¶ 15 For example, in *Sawyer v. LaSota,* 119 Ariz. 253, 254, 580 P.2d 714, 715 (1978), we were asked to decide whether the legislature could require that the Attorney General be admitted to the state bar for five years preceding the date of taking office. Article V, section 2 of the constitution did not list that as a qualification for the office. We said:

> In a continuous line of cases commencing over 60 years ago, it has been held that the Legislature has no power to add new or different qualifications for a public office other than those specified in the Constitution.

*Id.* at 256, 580 P.2d at 717. We concluded that the statute was unconstitutional because it provided an additional qualification not required by the constitution. *Id.* This is an implied, not an express, limitation on legislative power.

¶ 16 *LaSota* relied upon *Whitney v. Bolin,* 85 Ariz. 44, 47, 330 P.2d 1003, 1005 (1958), for the proposition that:

> the enumeration of certain specified things in a constitution will usually be construed to exclude all other things not so enumerated. Positive directions in a constitution contain an *implication* against anything contrary to them.

(emphasis added). The question in *Whitney* was whether a "resign to run" statute would apply to a judge of the superior court when that judge became a candidate for the Supreme Court of Arizona. *Id.* at 46, 330 P.2d at 1004. We looked to the constitution describing the qualifications for judges of the supreme court. Superior court judges were not excluded. We said that "the power of the legislature is plenary and unless that power is limited by express or *inferential* provisions of the Constitution, the legislature may enact any law which in its discretion it

may desire." *Id.* at 47, 330 P.2d at 1004 (emphasis added). We held that the statute could not apply to a judge of the superior court because it would in effect be adding to constitutional qualifications.

¶ 17 We did not limit this view to qualifications for office. The basis for the holding was the more general "accepted constitutional construction that the enumeration of certain specified things in a constitution will usually be construed to exclude all others not so enumerated. Positive directions in a constitution contain an *implication* against anything contrary to them." *Id.* at 47, 330 P.2d at 1005 (emphasis added). *Whitney* thus acknowledged that constitutional limitations may be implied as well as express, and that this is a general rule not limited to qualifications for office.

¶ 18 And in *Hudson v. Kelly,* 76 Ariz. 255, 263, 263 P.2d 362, 367 (1953), we relied on Cooley's *Constitutional Limitations* to reject the proposition that the constitution contains no implied limitations.[2] We adopted the following, which Cooley, in turn, adopted from the New York Court of Appeals: "The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the law-making authority as strong as though a negative was expressed in each instance." *Id.*

¶ 19 Neither *Cox* nor *Frohmiller* is inconsistent with the doctrine of implied limitations. They just had no need to address it. In *Cox,* for example, in extending the appellate jurisdiction of the superior court from inferior courts to administrative agencies, the legislature was doing something consistent with and not in conflict with the constitution. The extension was within the scope of article VI. So, too, in *Frohmiller,* providing per diem expenses to legislators was not inconsistent with that part of the constitution

---

**2.** Cooley noted that "[t]he inhibition of a Constitution may be either express or implied; that is the Constitution may expressly prohibit any specified act of the legislature, or the Constitution by its inherent terms may of necessity prohibit certain acts of the legislature by reason of the inher-

ent conflict that would arise between the terms of the Constitution and the power claimed in favor of the legislature." 1 Thomas M. Cooley, *Constitutional Limitations* at 176 n. 4 (8th ed.1927).

which provided for legislative compensation. Instead, it was in aid of it.

¶ 20 But in the instant case, we have something very different. In contrast to *Cox*, this is not a case of enlarging a preexisting judicial power. By involving the Commission on Appellate Court Appointments in activities wholly unrelated to the nomination and appointment of appellate judges, the Act violates limitations implied by the constitution itself. This is not a case of legislative enactment in the face of a silent constitution. In such cases, the legislature can ordinarily act. But here, the constitution is quite express. It creates a commission whose sole function is to screen and nominate candidates for judicial office.

¶ 21 We do not, of course, suggest that the screening and nomination of judicial candidates may be characterized as a judicial function. The Commission does not adjudicate disputes, nor was it conceived or established as an adjudicative body; indeed, by the screening and nomination of judicial candidates, the Commission partakes in a process that is otherwise assigned to the executive department. And yet the Commission was neither established as a free-floating screening body for gubernatorial appointees nor placed within the executive department under article V. Rather, it was confined within article VI as an entity of the judicial department. Its title bespeaks its single function— it is the Commission on Appellate Court Appointments. And as we have indicated, although the constitution expressly grants the legislature authority to enlarge the powers and duties of other constitutional officers and bodies, the constitution makes no such grant of authority with respect to the Commission.

¶ 22 By giving it functions wholly alien to its constitutional charter, A.R.S. § 16–955(B) and (C) violate the constitution. The Act is simply incompatible with article VI, sections 36 and 37. We thus agree with the superior court that those portions of the Act which expand the duties of the Commission on Appellate Court Appointments beyond the scope of judicial appointments are inconsistent with the Arizona Constitution.

### III.

### Severability—Commission on Appellate Court Appointments

■ ¶ 23 Citizens for Clean Elections Commission and Arizonans for Clean Elections argue that even if part of the Act is unconstitutional, that part is severable and the remainder of the Act can function. They note that the Act has an express severability provision in it. A.R.S. § 16–960.[3] They also rely on *Randolph v. Groscost*, 195 Ariz. 423, 989 P.2d 751 (1999), in which we articulated a variation on the severability test for legislative measures that are begun by initiative. Under this test, we ask whether the valid portion can operate without the unconstitutional provision and, if so, we will uphold it unless the result is so absurd or irrational that one would not have been adopted without the other. *Id.* at 427, 989 P.2d at 755.

¶ 24 It appears to us that the Act will work without the Commission on Appellate Court Appointments. By severing all references to the Commission on Appellate Court Appointments, the statewide officers in whom the appointment power is vested will make appointments, subject to statutory standards, A.R.S. § 16–955(B), but without a slate of candidates. The statewide officers who make appointments must select persons "who are committed to enforcing [the Act] in an honest, independent, and impartial fashion and to seeking to uphold public confidence in the integrity of the electoral system." A.R.S. § 16–955(B). Appointments will be made by officers of alternating political parties. The appointees cannot have, in the previous five years, "been appointed to, been elected to, or run for any public office, including precinct committeeman, or served as an officer of a political party." *Id.* Thus,

---

**3.** Section 16–960 provides:

If a provision of this act or its application to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the act that can be given effect without the invalid provision or application, and to this end the provisions of this act are severable in any court challenge to the validity of this article. The commission and Arizonans for clean elections shall have standing to intervene.

the Clean Elections Commission will be no less non-partisan without the involvement of the Commission on Appellate Court Appointments. We easily conclude that the valid portions of the Act considered separately can operate independently and are workable.[4]

¶ 25 Nor is the result so irrational or absurd as to compel the conclusion that an informed electorate would not have adopted one portion without the other. *Randolph*, 195 Ariz. at 427, 989 P.2d at 755. Had the electorate enacted the Act without the Commission on Appellate Court Appointments, or any other screening body, we could not conclude that the legislation was irrational. The people could have selected such a regime and it would have passed the rational basis test for due process violations. Indeed, the express severability clause, *ante* at ¶ 23, n. 3, informs us that all doubts are to be resolved in favor of severability. We thus disagree with the trial court on this issue and hold that the offending portions of the Act relating to the Commission on Appellate Court Appointments are severable. We hereby sever only those portions of A.R.S. § 16–955 that involve the Commission on Appellate Court Appointments.

### IV.

### Senatorial Concurrence in Removal

 ¶ 26 Under the Act, A.R.S. § 16–955(E), the Governor may remove members of the Citizens Clean Elections Commission only for cause and only with the concurrence of the senate. The trial court concluded that this violated the doctrine of separation of powers.

 ¶ 27 The power of removal, like the power to appoint, is not expressed in the Arizona Constitution. But we have held, consistently with the doctrine of implied limitations on the exercise of legislative power discussed *ante*, that the Governor's duty to take care that the laws be faithfully executed under article V, section 4, includes the power to remove subordinates. *Ahearn v. Bailey*, 104 Ariz. 250, 253, 451 P.2d 30, 33 (1969).

This is an implied limitation on the legislature's power. In *Ahearn*, we concluded that while the legislature may define the causes for removal, it could not directly remove a public officer except by impeachment. *Id.*

¶ 28 The Act does not purport to allow the legislature to remove a member of the commission. But it does condition the Governor's power to remove upon the senate's concurrence. We acknowledge that senate concurrence in removal is more intrusive than senate concurrence in appointment. This is so because if the senate chooses not to approve a gubernatorial appointment, the Governor may try again. But if the senate does not concur in the removal of a public officer by the Governor, the Governor, if she is the appointing officer, is left with that person. If that person was someone under the direct control and supervision of the Governor, or someone whose cooperation was vital to the Governor's exercise of her own constitutional powers, we would not hesitate to conclude that senatorial concurrence would unduly interfere with an exercise of an executive power and thus violate the doctrine of separation of powers. *See Ahearn*, 104 Ariz. at 253, 451 P.2d at 33 ("The Governor ... must ... have the power to select *subordinates* and to remove them if they are unfaithful.") (emphasis added).

¶ 29 But this case is different. The members of the Citizens Clean Elections Commission, once appointed by the Governor or any other state official, are not subject to gubernatorial supervision or control. They are not part of the executive team. They are not subordinates of the Governor or any other official who may have appointed them. Indeed, the statute requires that they act quite independently of elected officials. A.R.S. § 16–955(B). In addition, their powers under the Act are limited to voter education and enforcement. A.R.S. § 16–956.

¶ 30 In *State ex rel. Woods v. Block*, 189 Ariz. 269, 276, 942 P.2d 428, 435 (1997), we subscribed to a four-part test to evaluate separation of powers claims: (1) the nature of the power being exercised; (2) the degree

---

4. For these same reasons, the incumbent members of the Clean Elections Commission, having been properly appointed, can continue to serve.

The severance of the role of the Commission on Appellate Court Appointments has no effect on the validity of their appointments.

of control of another branch; (3) the purpose of the legislation; and (4) the practical consequences of the action. From what we have said so far, we believe that the provision for senatorial concurrence in the removal of members of the Citizens Clean Elections Commission does not violate the doctrine of separation of powers. The power being exercised, concurrence, unlike removal, is not an executive power. The degree of control is minimal. The purpose is cooperative. There has, as yet, been no consequence.

## V.

### Appointments made by Supreme Court Justices

■ ¶ 31 VotePac's argument that the Chief Justice's role as chair of the Commission on the Appellate Court Appointments itself violates separation of powers is mooted by our holding that the involvement of the Commission on Appellate Court Appointments is unconstitutional. *Ante*, at ¶ 22. This leaves for consideration VotePac's argument that it is a violation of the doctrine of separation of powers to allow members of the Supreme Court of Arizona to make appointments to the Citizens Clean Elections Commission.

¶ 32 Article VI of the Arizona Constitution vests judicial power in the judicial branch of government. Ariz. Const. art. VI, § 1. It describes the qualifications of members of this court, article VI, section 6, and defines our jurisdiction and functions. Ariz. Const. art. VI, § 5. Unlike the executive and legislative branches, the judicial branch is purposely non-political. Under merit selection and retention, the justices of this court do not sit as members of political parties. They are nominated and appointed "without regard to political affiliation." Ariz. Const. art. VI, § 36(D) and § 37(C). Yet, the Act not only purports to involve the members of this court in the appointment of members to the Citizens Clean Elections Commission but it does so based upon their party affiliation.

¶ 33 Three problems immediately arise. First, the appointment power is an executive function, not a judicial function. *See Block*, 189 Ariz. at 277, 942 P.2d at 436. Second, the Citizens Clean Elections Commission has functions wholly unrelated to the judicial power vested in this court under article VI of the constitution. (Implied limitations again). Third, whether a particular member of this court makes an appointment is a direct function of that member's political party affiliation, which is directly contrary to article VI, section 36(D) and section 37(C) that the members of this court do not sit as Republicans, Democrats or anything else in their capacity as justices. For all of these reasons, it is clear enough to us that to the extent that the Act includes members of this court as officials who may appoint members of the Citizens Clean Elections Commission, A.R.S. § 16–955(C), it is unconstitutional.

■ ¶ 34 This is such a small and insignificant part of the Act, however, that we can say with confidence this portion is severable under *Randolph* (it works without it and the remainder is not irrational). We hereby sever it.[5]

## VI.

### Title of the Act

■ ¶ 35 In *Meyers v. Bayless*, 192 Ariz. 376, 378, 965 P.2d 768, 770 (1998), we upheld the title "Citizens Clean Elections Act" under article IV, part 1, section 1(9) of the constitution. VotePac now argues that the title is insufficient under article IV, part 2, section 13 of the constitution. VotePac acknowledges that in *Iman v. Bolin*, 98 Ariz. 358, 365, 404 P.2d 705, 710 (1965) we held that article IV, section 13 applies only to the acts of the legislature, and not to initiative measures. Nevertheless, VotePac argues that article IV, section 13 should apply to initiatives after their enactment. But it either applies or it does not—the timing cannot matter.

¶ 36 VotePac also seeks to limit the effect of *Iman* to initiatives proposing constitution-

---

**5.** We note that no member of the Clean Elections Commission was appointed by a member of this court.

al amendments. But the initiative in *Iman* was not a constitutional amendment. We decline to give *Iman* such a narrow reading. We affirm *Iman* for the proposition that article IV, part 1, section 1(9) applies to initiatives and article IV, part 2, section 13 applies to bills. Thus article IV, part 2, section 13 does not apply to the Act.

## VII.

### Conclusion

¶ 37 Those provisions of the Citizens Clean Elections Act that purport to involve the Commission on Appellate Court Appointments are unconstitutional and are hereby severed from the Act. That provision of the Act that purports to involve members of this court in the appointment of members to the Citizens Clean Elections Commission is unconstitutional and is hereby severed from the remainder of the Act. The order of the trial court is vacated. The case is remanded to the trial court for entry of judgment consistent in all respects with this opinion.

CONCURRING: RUTH V. McGREGOR, Justice, NOEL A. FIDEL, Judge.

FELDMAN, Justice, concurring in part, dissenting in part.

¶ 38 I join the majority's opinion, except Sections II (¶¶ 8 through 22) and III (¶¶ 23 through 25). I dissent from Section II because I have serious reservations about some of its language and disagree with the conclusion that the assignment of nominating duties to the Commission on Appellate Court Appointments violates our state constitution. Believing the assignment of such duties is not unconstitutional, I conclude that the severability discussion in Section III is irrelevant and therefore do not join in that section.

### A. The Commission on Appellate Court Appointments

¶ 39 In Section II, the majority concludes that A.R.S. §§ 16–940 to 16–961 (the Act) gives the Commission on Appellate Court Appointments (the Commission) "functions wholly alien to its constitutional charter" and thus violates the constitution. *Ante* ¶ 22. The majority does not tell us which section of

the constitution is violated but does say that the Commission's duties under the Act are "simply incompatible with article VI, sections 36 and 37" of our constitution. *Id.* While the majority argues that this finding arises from the language of the constitution, it cites no textual prohibition to the legislative assignment of additional functions, thus violating " 'the presumption that the Legislature is acting within the Constitution ... until it is made to appear *in what particular* it is violating constitutional limitations.' " *Earhart v. Frohmiller,* 65 Ariz. 221, 224, 178 P.2d 436, 438 (1947)(*quoting MacMillan Co. v. Clarke,* 184 Cal. 491, 194 P. 1030, 1032 (1920) (emphasis added)). Given the plenary nature of the state's legislative power, the finding of incompatibility, in the absence of textual prohibition, necessarily presupposes that the Commission's functions are judicial in nature and its work, therefore, part of the operation of the judicial branch of government.

¶ 40 But even a cursory examination reveals that there is no incompatibility between the functions constitutionally assigned to the Commission and those additional duties assigned by the Act. While the Commission is established by section 36 of the judicial article of the constitution, it is not a judicial entity. Ten of its sixteen members are lay persons and five are lawyers nominated by the State Bar. All fifteen are appointed by the Governor and confirmed by the Senate. Ariz. Const., art. VI, § 36. The only judicial officer on the Commission is the Chief Justice, who presides over the Commission's meetings. *Id.* We thus have a Commission composed almost entirely of persons who do not hold judicial office and are not members of the judicial branch.

¶ 41 Nor are the Commission's functions judicial in nature. The Commission adjudicates nothing, and its work is unrelated to any adjudicatory or judicial function. Its sole constitutional duty is the nomination of candidates for appointment by the Governor to the appellate bench. *Id.,* § 37. The selection process for judicial office is not a function of the judicial branch. In this country quite the opposite is true: the entire appointment process, including nomination and con-

firmation, has always belonged to the other branches of government. I see no support, therefore, for the majority's idea that the duties the constitution assigns to the Commission uniquely belong to the judicial branch. Neither the composition nor the functions assigned to it by the constitution compel such a result. I disagree, thus, with the majority's conclusion that the duties the Act assigns to the Commission are incompatible with its constitutionally assigned duties. Furnishing slates of names for gubernatorial appointment is exactly what the Commission was created to do.

¶ 42 VotePac argues, however, that the Commission was designed to screen and nominate candidates for judicial office and that "a serious conflict is created when the legislative branch assigns duties to the [Commission] that have no relation to the administration of justice" and "create [an] inherent conflict and are repugnant to its judicial purpose." Response to Petitions for Special Action at 11. Evidently VotePac, and perhaps the majority, fears that exposing the Commission to a role in partisan election activities will compromise the Commission's nonpartisan constitutional role in the selection of judges. Here, again, the assumption is quite unsupported. ·

¶ 43 The constitution describes the Commission as nonpartisan. Art. VI, § 36. But party membership must be considered in appointing Commission members. The constitution requires the Commission to make its decision "without regard to political affiliation." *Id.*, § 36(D). But governors hold political office, and no matter what their political persuasion, they take politics into consideration in making appointments to the Commission and bench. Anyone familiar with the workings of the Arizona nominating commissions knows there are political pressures on the commissioners. Politics is not wholly alien to them. While the members of all three nominating commissions have done excellent work in a difficult task, they do not live in a vacuum and are quite familiar with the pressures arising from our political system. It is doubtful whether their activities in nominating a relatively few nonpartisan slates for appointment to

the Clean Elections Commission would expose them to any greater or different political pressure than their work in nominating a much larger number of nonpartisan slates for appointment to the appellate bench. Thus I disagree with the majority's largely unexplained conclusion that the Commission's duties under the Act are "wholly alien to its constitutional charter" under article VI, §§ 36 and 37. *Ante* ¶ 22.

¶ 44 But the majority ignores any analysis of the Commission's nature and functions and, in its search for a constitutional basis, raises a new and dangerous concept of state constitutional law.

### B. Change in constitutional doctrine

¶ 45 To buttress its opinion, the majority states that one "conclusion that might be drawn from textual analysis [of the constitution] alone is that where the constitution intends that the legislature have the power to expand the duties of a constitutional entity, the constitution will so state." *Ante* ¶ 10. If this were merely a recitation of VotePac's argument, I would have no objection to it or to the corollary that "the duties of the constitutional entity are only those specifically described by the constitutional grant of authority." *Id.*

¶ 46 The majority, however, seems to approve VotePac's argument in a misplaced reliance on *Whitney v. Bolin*, 85 Ariz. 44, 330 P.2d 1003 (1958). *Whitney* dealt with the qualifications for holding an office established by the constitution and simply held that where the constitution sets qualifications for an office, the legislature is without power to add to or subtract from such qualifications. *Id.* at 47, 330 P.2d at 1005; *see also State ex rel. Sawyer v. LaSota*, 119 Ariz. 253, 580 P.2d 714 (1978), the other case cited by the majority. *Ante* ¶¶ 15–17. There is no quarreling with these cases because by reciting qualifications, the constitution has prescribed all that is necessary for holding the office in question, and any legislative attempt to add or subtract qualifications impliedly conflicts with the constitutional text.

¶ 47 The present question is not comparable at all, yet the majority uses *Whitney*'s language that when the constitution contains

"[p]ositive directions," there is "an *implication* against anything contrary to them." *Ante* ¶ 17 (quoting *Whitney,* 85 Ariz. at 47, 330 P.2d at 1005 (emphasis added)). *Whitney,* however, used this language in the context of changing, and thus violating, the constitution's textual prescription of what was necessary to hold a particular office. In our case, the legislative assignment of additional nominating duties does not conflict with, impact, or affect the Commission's performance of its constitutional duties. The Act assigns a different and additional duty that does not relate to or affect the duties assigned and granted by the constitution. Indeed, we have expressly renounced the idea that the constitution's express assignment or grant of a particular legislative power implies a denial of other powers not specified. *Cox v. Superior Court,* 73 Ariz. 93, 96, 237 P.2d 820, 822 (1951) (state legislative power is plenary and, unlike federal, not based on express constitutional authorization; nor should rule of *expressio unius est exclusio alterius* be used to restrict state's plenary legislative power).

## C. Exegesis

¶ 48 The majority makes the necessary obeisance to this basic principle of state constitutional law by stating that it "agree[s] with and re-affirm[s] the rule of *Frohmiller* and *Cox* that the legislature need not look to an express grant of authority in order to justify an enactment." *Ante* ¶ 14 [1] Then, however, it relies on those cases for the further principle that such plenary power "is subject to the limitations imposed by the constitution." *See ante* ¶ 14. Such limitations, the majority says correctly, may be found in both the express text of the constitution and, by implication, necessarily arising from the constitution. *Id.* For this dictum,

the majority relies on our past approval of the following words in Judge Cooley's 1927 work:

> The frame of the government, the grant of legislative power itself, the organization of the executive authority, the erection of the principal courts of justice, create implied limitations upon the law-making authority as strong as though a negative was expressed in each instance.

*Ante* ¶ 18, quoting from 1 THOMAS M. COOLEY, CONSTITUTIONAL LIMITATIONS 176 (8th ed.1927), and citing *Hudson v. Kelly,* 76 Ariz. 255, 263, 263 P.2d 362, 367 (1953).

¶ 49 Judge Cooley's words, however, were not written to justify the rule that the expression or grant of a particular legislative power implied a denial of related powers. They were written in the context of a discussion about the separation of powers doctrine. The frame of the government to which he referred was the separation of powers between the legislative branch on the one hand and the executive and judicial branches on the other. As he wrote two paragraphs after the words quoted by the majority:

> I entertain no doubt, ... that, aside from the special limitations of the Constitution, the legislature cannot exercise powers which are in their nature essentially judicial or executive. These are, by the Constitution, distributed to other departments of the government. It is only the legislative power which is vested in the [legislative body]. But where the Constitution is silent, and there is no clear usurpation of the powers distributed to other departments, I think there would be great difficulty and great danger in attempting to define the limits of this [legislative] power.

COOLEY, *supra,* at 179, quoting an unidentified Comstock, J.

---

1. As noted in the previous paragraph, in approving *Frohmiller* and *Cox,* the majority ignores the positive holding of these cases that in state constitutional law the express grant of power does not raise any implication that related powers are denied because not expressly granted. *Cox,* 73 Ariz. at 96, 237 P.2d at 821–22. In *Cox,* we expressly rejected that idea and the cases standing for that proposition. *Id.* at 95, 237 P.2d at 821. We adopted instead the following in answer to the argument that because the constitution granted the right to appeal only from cases

arising in inferior courts, by implication it prohibited the legislature from granting a right to appeal from decisions by executive tribunals:

> When the right is neither given nor denied by the Constitution, it is then within the discretion of the legislative authority to grant it or take it away, to enlarge or circumscribe the remedy, and to say in what cases, and under what circumstances, and whence appeals may be taken.

*Id.* (quoting *Hoeye v. Willis,* 15 Ariz. 257, 259–60, 138 P. 15, 16 (1914)).

¶ 50 It is here, I believe, that the majority makes its basic error. There are implied limitations to the legislative power, but as Judge Cooley said, they arise not from the grant of express powers but from the frame or structure of government, the separation of powers between the legislative, executive, and judicial branches. In the absence of express text prohibiting the exercise of legislative power, the plenary power to legislate is restricted only by the prohibitions against enacting measures that violate the separation of powers between legislative, executive, and judicial branches. On this subject, Arizona has a considerable body of jurisprudence that the majority has overlooked in its attempt to grapple with the Commission's functions.

## D. Separation of powers

¶ 51 I need only advert to a few of this court's many cases dealing with the doctrine of separation of powers prescribed by article III of our constitution. We recently considered a case in which the validity of a statute was challenged on grounds that the legislature violated article III because, by its power of appointment, it controlled a governmental agency performing an executive function. *See State ex rel. Woods v. Block*, 189 Ariz. 269, 942 P.2d 428 (1997). We adopted a four-part test "to determine if one branch of government 'is exercising "the powers properly belonging to either of the others." ' " *Id.* at 276, 942 P.2d at 435, quoting *J.W. Hancock Enterprises v. Arizona State Registrar of Contractors*, 142 Ariz. 400, 405–06, 690 P.2d 119, 124–25 (1984), and Ariz. Const. art. III. Approving a previous opinion from our court of appeals, we said that when a

"statute is challenged under the constitutional doctrine of separation of powers, the court must search for a usurpation by one department of the powers of another department on the specific facts and circumstances presented." The court is to evaluate the following factors: the "essential nature" of the powers being exercised, "the degree of control by the legislative department in the exercise of the power," the objective of the Legislature, and the practical consequences of the action, if available. This ... test ... provides "the necessary flexibility to government," yet

"preserves the essential goal of the separation of powers theory," to prevent "the concentration of the whole power of two or more branches in one body."

*Id.* at 276, 942 P.2d at 435, citing and quoting variously from *State ex rel. Schneider v. Bennett*, 219 Kan. 285, 547 P.2d 786, 792 (1976), and *J.W. Hancock*, 142 Ariz. at 406, 690 P.2d at 125.

¶ 52 The essential nature of the nominating power to be exercised by the Commission in the present case is executive, rather than judicial, because it is part of the appointment process. Even assuming the Commission is part of the judicial branch, obviously the legislative branch will exercise no control over the Commission's functions and actions. The Commission may nominate whomever it wishes for appointment by the executive branch. The objective of the clean elections initiative was to ensure, so far as is possible, a high quality of membership and a lesser degree of partisanship on the Clean Elections Commission. Given that this is also the goal of the Commission in nominating for judicial office, it is plain that the Act's objective is healthy and does not conflict with any constitutional function. Nor is there any evidence that the practical consequences of giving the Commission the additional nominating power will unduly affect the performance of its constitutionally-assigned duties.

¶ 53 Thus, I believe the Act withstands challenge under the separation of powers clause. It does not compel a judicial agency to find a certain set of facts or declare a certain principle of law; nor does it impair or affect any adjudicative function. *Cf. San Carlos Apache Tribe v. Superior Court*, 193 Ariz. 195, 201–02, 972 P.2d 179, 217–18 (1999) (invalidating statute that purported to require agency with adjudicative functions to find facts and decree law in accordance with legislative rather than judicial standards and findings). With the complexities of today's government, "some blending of powers is inevitable," but "the separation of powers doctrine ensures 'sufficient checks and balances to preserve each branch's core functions.' " *Id.* at 211, 972 P.2d at 195 (quoting *J.W. Hancock*, 142 Ariz. at 405, 690 P.2d at

124). In the present case, as in others, the exercise of the power given to the Commission seems "practical and not intrusive upon the court" so that there is no usurpation of the power and no violation of article III. *Martin v. Reinstein*, 195 Ariz. 293, 322, 987 P.2d 779, 808 (1999) (upholding legislature's selection of rules to apply to new civil commitment procedure).

¶ 54 The distinction between what is constitutionally allowed by the separation of powers doctrine becomes apparent when we compare Section II of the majority opinion, from which I dissent, with Section V, in which I join. Section V holds that the portion of the Act giving judges of this court power to appoint members of the Clean Elections Commission violates article III and for the first time applies our jurisprudence on separation of powers. It holds that under *Block* and *J.W. Hancock*, justices of this court may not be given power to appoint members of an executive agency whose work, when challenged, would be ultimately reviewable by this court.

¶ 55 The present case is not comparable. The Commission has no adjudicative power or responsibility. Its members are not judicial officers, and political affiliation must be considered in both their appointment and in the performance of their duties. *See ante* ¶ 32 and compare with article VI, § 36(A). The nomination of slates from which political office holders will appoint members of the Clean Elections Commission is not much different from the Commission's constitutional function to prepare slates of nominees for the Governor to appoint to judicial office. Thus, in my view, Section II of the majority opinion is incompatible with Section V. The principles of Section V ought to have been applied to the nomination process as well as the appointment process.

¶ 56 The problem with the majority's opinion is that it may well initiate a search for implied prohibitions to the state's plenary legislative power—a search that will not stop, I am afraid, with this case. From this point forward, I fear, unhappy litigants will be able to argue, with basis in precedent, that a statute is unconstitutional merely because the constitution has not expressly authorized the exercise of a particular legislative power even though it has granted other and similar powers to the legislative branch. If, in the future, this court will imply constitutional restraints other than those arising from the separation of powers clause and from conflict with constitutional text, we shall today have created a pernicious doctrine that will eventually have to be curbed, if not overthrown in its entirety.

¶ 57 Thus, I dissent from Section II of the majority's opinion. I would find the assignment of duties to the Commission was valid. I therefore need not join in the severability discussion of Section III but do join in the rest of the opinion.

CONCURRING: WILLIAM E. DRUKE, Judge.

Chief Justice THOMAS A. ZLAKET and Vice Chief Justice CHARLES E. JONES did not participate in the determination of this matter. Pursuant to article VI, section 3 of the Arizona Constitution, the Honorable NOEL A. FIDEL, Judge of the Arizona Court of Appeals, Division One, and the Honorable WILLIAM E. DRUKE, Judge of the Arizona Court of Appeals, Division Two, were designated to sit in their stead.